Case number 23-5698 Kerry Cox et al versus Anthony Ruckel. Mr. Roberts for the appellant. Good morning your honors, the police, the court. My name is T.J. Roberts. I represent Kerry Cox and Guy Mead for the appellants. Your honors, this case is about a turning point in which the appellant sought help from their local government and in return for their First Amendment activity faced a harassment campaign, faced unlawful government action against them, and ultimately faced a state court lawsuit resulting from this suit itself. So your honor, I plan to address two issues in which I have a couple sub-issues within them. The first one is the motion to dismiss and that the court improperly dismissed appellee Wallingford. And then second, I'll be addressing the summary judgment matters in which the court improperly granted summary judgment to the remaining appellees. Can I ask you a question about the protected speech? Yes, your honor. The complaint seems to allege that it's speech that she made at the meeting where she alleged that county funds were being used illegally. Yes. Do you need the alleged sham affidavit in order to establish that this protected speech was made, given that none of that is on the video? So your honor, I believe that there's a fact issue with that. In fact, even without the affidavit, I believe that the affidavit is consistent with the prior testimony of multiple other witnesses. Mr. Ruckel at dock number 54 at 56, page ID 1183, Cox's deposition testimony documents. She says she can't really remember, but says she probably made the statements. But you agree under like Scott D. Harris that we look at the video, right? I mean, if I don't see her making the statements on the video, she has to make them off the video. And in order for that to be in the record, don't you have to have the meat affidavit? Your honor, for that specific statement, yes. Now for the remainder of Ms. Cox's statement, I don't believe so. But in terms of this, the remainder of the statements of discussing the inadequate response times for the sheriff's calls, which was part of the motivations for the appellees to engage in the easement action, the harassment actions as well. That's some of the other matters that were discussed during the fiscal court meeting as well. During the video? That is, so Cox's remarks are not on the video, but she testifies to absolutely having testified to those matters. Now, she doesn't say she was speculating. What does she say she was speculating about? That was about the illegal use of tax funds. That's the part where she says she probably said that, that she just doesn't remember the specifics. Now, the meat declaration does directly state that that happened. But I believe that Scott versus Harris is easily distinguishable from this case, your honors. And the reason is that no one testifies that that is the complete video of the recording. In fact, when you look at the testimony, they all state that that's incomplete, that there was statements that were not necessarily captured on it, particularly Harrison's deposition, document 55 at pages 34 through 35, page IDs 1270 through 71. So at the very least, there is a fact issue on whether or not these statements were made. But on top of it, 1270 to 1271, counsel asked, do you recall Ms. Cox or Mr. Mead addressing anything in terms of the county money being spent? And Harrison responded, I suspect they did. Right. And your honor, I believe that that in itself creates a fact issue that he stated, I suspect that that happened. But that's speculation. I suspect they did. I don't know. I suspect they did. How does that create a fact issue? It's on the grounds that the testimony is inconclusive of whether it happened or not. But then he says later, I can't specifically remember any conversation that was had during the meeting. Right. And that's the part that creates the fact issue, is that there is... But then what's the affirmative evidence that it happened? So for... Because Harrison's saying, I'm speculating and I can't remember. So for what... So your honor, I believe that the Mead's declaration is the fact... That was stricken, right? Right. And we appeal the strike... I understand. But so do you have to win on the Mead deposition? In order for that statement, yes. Now, in terms of the reason why this was appealed, the reason that this affidavit should be put in is because one, the... So for one, it wasn't contradictory with the prior evidence. And that's specifically when you look to the... Do you agree that if she had filed that affidavit, that it would be a sham? If she had filed the affidavit... If she had filed an affidavit that said, oh, by the way, I just remembered. I said this after the video was over. Yes. And I said it and whatever. Would that be a sham? Would that have been a sham? If she did so, yes, because she has previously gone on the record saying, I don't remember. However, Mr. Mead... What was his deposition testimony? Was there anything even close to contradictory? No, your honor. The only things that he was asked about in terms of the meeting was about what he himself said. And that's specifically at... And that's document 70. Is that where he said, I can't really remember because I was just in an accident? Right. And that was about what he said. So they specifically asked about what he said, which draws a distinction. They didn't ask, do you remember what others said? Do you remember what Kerry Cox said? It was only about his statements. But why doesn't the fact that it's still being the complete just absence of this factual testimony and then you're doing it in summary judgment make it suspicious? So your honor, in terms of contradiction, our case law requires it to be narrowly defined. Specific. So ultimately, when you're only asked about that, it seems like a critical issue. And your honor, there's no duty of the deponent under our case law, under ARIL SRL. You're the plaintiff. There's a duty to have affirmative evidence. And without this, you don't have affirmative evidence, right? You come to summary judgment, you have to have affirmative evidence. If this was the case, in every case, all discovery would be irrelevant because as soon as you get a summary judgment motion, you just put in an affidavit. So your honor, on that issue, the affidavit I believe still was admissible just on the grounds that they never asked it. They were the ones moving for summary judgment on the issue. We were not. It's a grant of theirs. They can say, I move for summary judgment. They don't have to bring affirmative evidence. You do. Your honor, the appellees did move for summary judgment. Appellants did not. That's what I mean. The appellant has to bring, they can move for summary judgment and say, I move for summary judgment, full stop, filed. Yes, your honor. And then you have to bring affirmative evidence. I move for summary judgment because there's no material issue of fact. They don't. And then it's your job to present affirmative evidence showing there is an issue of fact. Yes. So your honor, we believe under ARIL SRL, under NTEC, Edmondson, Chavez, Crawford, which generally shows that contradictions in the Sixth Circuit are to be construed in a narrow sense that there was no contradiction, that this should have been admitted, which creates a dispute of fact. So on those grounds, we believe that this is grounds for reversal enough, which Johnson v. Ford at 501 through 02 demonstrates that improper reversals of the improper sham affidavit is grounds to reverse grants of summary judgment. Further, I do want to get into... That would get you the protected speech, but what else? Yes, your honor. I know you want to talk about Wallingford real quick. Yeah. But I can go on to the other two. I mean, just generally speaking, when it comes to the adverse action, you have the imposition of the easement. It was sufficiently pled in the complaint that that was motivated by the protected speech. And that's just one part of the protected speech. There was the mere attendance at the meeting. There was the threat of the lawsuit. But I mean, they get the easement. This guy Hughes owns the property and you go and get an easement from him. How is that adverse action? So, your honor, the easement was meant to deny and to grant trespassers further access into the Cox property to make it easier for access. We also have case law out of Thackery and Fritz that shows even miles. Why wouldn't that have been a better solution for her to have access on the other side of the bridge rather than having to use the road in front of her home? So, your honor, it was because it was used for access to the Cox property. On to the, I'm about to be out of time, but can I speak very quickly on the Ruckel matter? On the Wallingford matter. So, there's three elements on a conspiracy and that is from Rudd at 517. That there's a single plan to deprive the plaintiff of rights. That there's a shared objective among the conspirators. And that there were overt acts taken. You can see from paragraphs 30, 33, 34, 35, 6, 7, 43, 44, 45, 46 of our complaint that Wallingford was implicated throughout the conspiracy. But do you agree that simply pleading that somebody is in a conspiracy is just conclusory and not enough? So, your honor, we mentioned that he was directly involved in those specific actions. That he was directly involved in the actions of the plan itself to deprive the Cox of the property, to grant further access from the trespassers to the access of the easement. Especially in light of paragraph 36. When you read 37 in light of that paragraph, it demonstrates his direct involvement in it. So, your honor, this was on all fours with Rudd. And in full transparency, we pulled the Rudd pleadings to ensure that our complaint was sufficiently pled on this issue with the conspiracy claim. Okay, thank you, counsel. Thank you, your honor. May it please the court. My name is Robert Renfrow, and I represent the appellees Anthony Todd Ruckel, Terry Thomas, and Amy Kennedy. What this is, and I believe what the trial court ultimately determined, is that this is a, at the end of the day, a property dispute which is given some sort of constitutional veneer. The appellants have issues with alleged trespassing and with alleged harassment. And some of which that might be, have some sort of legitimacy to it. My client, specifically Todd Ruckel, saw that this was becoming an increasingly divisive issue, an increasingly heated issue. And based upon what he found at the courthouse in doing his own investigation, determined that he could come up with some sort of a solution that would benefit all parties that were involved. He took steps that the appellants necessarily didn't like. But as shown, neither the facts nor the law support the allegation that any of the actions that were taken by any of the appellees, or at least the ones that I represent, amounted to some sort of retaliation. And I believe that they've conceded as such. Why isn't the threat to open the road enough? Well, I don't, first of all, I don't think that Mr. Ruckel had any sort of threat to open the road. Okay, it's pled in the complaint. Yes. So don't, I mean, and there's basically just he says no, she says yes. It's based on a phone call, right? Well, in terms of the actual road itself, there's, so the bridge was like a kind of a counter, or a prior county road. And the road itself would just basically just go to the bridge in and of itself. It doesn't really access so much. But there was a gate in front of the road, right? There's not a gate. There's like three bars. There was some attempt to restrict access to the road. And he allegedly tells her on the phone, well, I'm going to take away that. We're going to open the road up to the bridge. Why is that not a threat to, a threat to do something that would be adverse action? Well, I think there, even if that was some sort of threat, I think they have to show that that was based on retaliation for some sort of statements that were made at the October 2019 fiscal court meeting. And I think the record reflects that. Right. But why can't you just say, hey, he told me, he told me not to speak at this meeting. I spoke at this meeting where I accused them of illegally using county funds. And then lo and behold, a couple of days later, he calls me and says, hey, we're going to open, I'm going to look at opening this road. I mean, why couldn't you infer? I mean, look, yes, there's a lot of disputes in there. But why can't a juror just infer, hey, that seems like that could be retaliatory? Well, I guess to begin with, I think that was something that was discussed even prior to the October 2019 fiscal court meeting. And secondly, and sort of the, I think there's the implication that a few days later, all this stuff happened. But there are quite a few steps in the meantime to where it indicates that there really wasn't any sort of retaliatory motive in this. Mr. Ruckel went to the clerk's office. But I thought he told, I thought the allegation is he told Ms. Cox to stay quiet or he would open the road. I think, I think that was some sort of retaliation there. But I don't think that had anything to do with whether or not there was retaliation based on the statements made at the meeting. Because ultimately for a retaliation claim to succeed. So if Cox had brought an independent claim saying they silenced me in violation of my First Amendment rights by threats of retaliation, if I spoke, that would survive? Well, if there was some sort of, if there was, if I'm understanding your question correctly, if the allegation was that the appellants were going to, or threatening, I guess in a way, to exercise some sort of First Amendment right. And then based on that. Well, appellees, there's an article coming out and Ruckel says, hey, an article's coming out. If you all say anything contrary, I'm going to open the road. If that was what the facts actually indicated, then there would be some sort of retaliation that one can find there. But the facts in the case and the record shows that there's no evidence to support that claim. The evidence indicates that he actually did some sort of independent investigation, found this survey, which was made in 2005, went to the surveyor and said, you know, what's going on with this survey? There was, I think, Harrison testified that Mr. Harrison, Mr. Ruckel, and the surveyor all met. And the gist of the conversation was, is this survey accurate? It was. And then he goes and gets an easement on property that was ultimately found, or that he found, was not actually the appellant's. I don't see where there's any sort of retaliation. But the road is a different, the easement is on the red part or whatever, right? I'm thinking about that map. What is it? It's red and blue and green or something? The road is the blue part, isn't it? I'm trying to remember all the colors there, but yes. So you're talking about him doing independent research and finding, I'm not talking about getting the easement. I don't know whether that's adverse action or not. I'm talking about the threat allegedly made in a phone call to open the road. If you dispute what's going on in the article, I'm going to open the road. Now, perhaps it's not retaliation for what was said at the meeting. The complaint doesn't, the complaint seems to plead that it's retaliation if you dispute what's going to be in the article. But put that aside for a second. Why wouldn't the threat to open the road be an adverse action? That's what I'm asking. Well, I don't, because I don't think it's something to where somebody would find that that would chill their right to exercise their first member privileges. Because all it's saying is, you know, to try to deal with this situation, I'll just, let's just open the road and then hopefully everything will kind of be solved and we don't have to worry. So you're saying it's not adverse because the person of ordinary firmness, whatever the test is, although you agree a private citizen is kind of the lowest on the ladder there, right? In terms of what they have to tolerate to be adverse action? Yes. So knowing every, putting all of this in context and what's going on with this property, why isn't a threat to, hey, I'm going to open this road that goes right in front of your house and it's going to be open season for anybody that wants to go to this bridge or just going to go use it? Well, I think two reasons. Number one, I don't, I think based on that map, he didn't necessarily have the authority to even open up the road because the county itself didn't know the road. That was, the state had the right of way. Well, okay. But I guess, A, there was a quiet title action that had to later had to sort all that out. And B, there was this gate or whatever it was, there was supposedly the county was restricting access. So as far as Ms. Cox knew, you guys are allegedly, I suppose, but you're restricting access and then the threat is, oh, we're not going to restrict access anymore, right? Well, you can still not restrict access because ultimately, and I think the appellants would even admit, they don't own the bridge itself. The bridge is for anybody to go to, to enjoy and to get benefits from. So the mere fact that we might lower some sort of impediments to access the bridge, that's not really anything that would, that's not really sort of an act of retaliation that would even be actionable. Did you perceive the appellants to be making that argument that the threat of opening the road is one of the adverse actions that they were relying on? From what I understand, the two arguments or the two actions they were relying on was the creation of the easement and ultimately the filing of the quiet title action. So it looks like my time is up. There's no other questions. May it please the Court, Your Honors. Scott McIntyre of Baker Hosteller on behalf of Appellee Jonathan Shane Wallingford. Mr. Wallingford is a county resident in Lewis County who grew up next to the historic Cabin Creek Bridge, which is a state shrine under Kentucky law, KRS 171-383. The bridge itself is of enormous personal interest to Mr. Wallingford. It's part of his heritage. It's part of the heritage of the state. It's part of the heritage of many folks who grew up in Lewis County. It's an important meeting and recreation place for the local residents. He's never been an elected official, Your Honor. He's a local business owner, a private citizen. He's never been accused of trespassing. He's never been accused of any wrongdoing. He's been a longtime advocate for the bridge, though. In the article he wrote in the newspaper, he references going back to 2008, his involvement with Senator Mitch McConnell's office and the Buffalo Trace, the local governing body, $1.2 million. He mentions in the article a bridge that cost taxpayers $1.2 million. Can I ask you about the conspiracy charge in the motion to dismiss? Because why isn't the complaint sufficient in that they allege an agreement between your client and Ruckel? They allege your client took action. So paragraph 30 of the complaint, they allege the agreement. Paragraph 36, they allege he took action. Why wouldn't that be enough to survive a motion to dismiss? Yes, Your Honor. Specificity is required under a conspiracy allegation. And I'll even go back to Twombly itself, which was a conspiracy claim. The only specific references to Mr. Wallingford, paragraph 29, paragraph 33, he's literally accused. Judge Wilhoyd got it right. He didn't misread the complaint. He's accused of writing an op-ed and assembling at the fiscal court meeting. Everything else in the complaint is obfuscation about all the other unnamed defendants. Paragraph 30 says, following this meeting, Ruckel, Wallingford, and other defendants then conspired to illegally retaliate. And then they allege the retaliation is the article. Respectfully, Your Honor, that is a legal conclusion. That's classic Twombly agreed to retaliate. Retaliate is a legal conclusion. It doesn't say how. It doesn't say what. It doesn't say when. It doesn't say any action, any single plan, a convoluted plan. It doesn't say that Mr. Wallingford agreed to do anything other than protected activity. Literally. But he then published the article in furtherance of the conspiracy to retaliate. That's where we get into Nora Pennington, Your Honor. The article literally itself is protected communication. And we cite the Bright to Life case. There's nothing in the- I agree the article's protected. But can't you consider the article to show that someone joined in a legal agreement? Absolutely not, Your Honor. Because that's immune under Nora Pennington to agree to do something that the law allows. Mr. Wallingford agreed to write the article. He wrote the article. He didn't agree. The argument is that he agreed to this conspiracy that the object was to retaliate against Cox and  Part of the retaliation was adverse action, First Amendment retaliation, not necessarily just publishing the op-ed. But the op-ed shows that he joined the conspiracy. So then you get tagged with the acts of the other people, right? So the Nora Pennington, he's not being tagged with his own First Amendment protected conduct. He's being tagged with the conspiracy conduct of his cohorts. There would have to be an allegation that there was a single plan to write the article, that he agreed to write the article. That's not in the complaint, that Ruckel told him to write the article. The plan is to retaliate. The article is an illustration of that. He was a willing participant in this conspiracy to retaliate. There's no allegation that he agreed that he formed an intent to do anything unlawful. Well, writing an article is there is an allegation that he. This is I agree. I have some questions about how conclusory it is, but there is an allegation that he conspired to illegally retaliate. So if Ruckel and Thomas are the ones who are doing the retaliating, and he agrees as part of the conspiracy that, hey, I'm going to be a part of it. And he shows, he manifests his agreement by, hey, I'll publish this op-ed. Turns out the op-ed is protected conduct. So he can't, that's not an overt act that anybody can be out liable for, but it could still be part of the conspiracy, right? No, Your Honor. There's no conspiratorial intent alleged or formed. And let me speak to the Rudd case as an example. They cite the Rudd case. The mayor in the Rudd case was accused of collaborating and failing to take any remedial action. So to your analogy, they never mentioned that in the brief. The Rudd case literally held that the mayor, the motion to dismiss the mayor was affirmed because that's not enough. Conspiracy allegations are dangerous. This is an end run around Twombly versus Iqbal. This is why Twombly was a conspiracy case, to see that we have to have more. Opening up discovery, getting individual business owners like my client ensnared into this because he wrote an article and attended a public meeting, that's why the standards are more than a conclusory. He agreed to conspire. How did he agree? Where did he agree? When did he agree? Who did he agree with? All of these kind of specificity, pleading by obfuscation. We cite the case that deals with... Well, he agreed with Ruckel and the defendants, whoever they're fled. I mean, yes, there's some does in there, but... No, go ahead. Well, I was going to say, he does give that specificity as to when it happened. It happened after the meeting. He conspired with the folks who Judge Nalbandian is mentioning. And I take them to be saying, as Judge Nalbandian has made a good point of, not that the conspiracy consisted of putting together the article, which might invoke Noah Pennington, but rather that him writing this article is evidence of his agreement, of him agreeing to what they were planning to do to retaliate overall. Who's they, Judge? Respectfully, this is all conclusory. And we can't assume that a... Conclusory allegation that he agreed to a conspiracy. What intent? Writing an article is the only specific act he's accused of. We've even gone through discovery, which you're not supposed to consider. Well, the conspiracy is to retaliate against them. I get it. I get maybe conclusory in terms of using the word retaliate, which is actually the legal thing that's involved. Yeah. Conspiracy to retaliate. Mr. Wallingford, his article talks about he's been an advocate for the bridge and the funding for years before Ms. Cox ever moved to Lewis County. The fact that it aligned with his interest doesn't necessarily mean anything. I'll go back to the bribery case we just heard. Aligning with interest. Respectfully, I think the fact that Mr. Wallingford pre-existing had an advocate, you can't just ensnare a political opponent because you write an article saying, well, it doesn't matter whether you have been a longtime advocate. It absolutely does. That's part of why Twombly v. Iqbal requires some degree of specificity. Gutierrez, the case from Your Honor's court, before even Twombly and Iqbal, talks about how dangerous civil conspiracy claims are. There has to be a degree of specificity. That's the Gutierrez case. You can wrap up if you want.  Your Honors, Mr. Hughes, the allegation is too, it's incredibly dangerous to consider the ramifications of merely alleging in a complaint. Look at what's going on in Washington, D.C. with government actors, lobbyists. This would ensnare everyone who actually writes an article, who advocates. The cases we cite, Judge Tate and Van Tatenhove talks about James Madison, the right to assemble in public or private to advocate for elected officials. That's implicated with this case. If we allow a private citizen to be accused of a conspiracy, this will be problematic. Thank you, Your Honor. So Your Honor, I want to start out by answering the question of who is they. It's on page one of the complaint. It's Anthony Todd Ruckel, Terry Thomas, and Amy Kennedy. Those are the remaining defendants that we still appeal on. So that's the remaining defendants, in addition to the John Doe defendants. So in terms of their claim that this complaint was not of sufficient detail to warrant to proceed against Wallingford, Wallingford is implicated in paragraphs 30. He's also implicated in 29, where we specifically indicate his motivations for it. Ruckel's supporters and friend, Shane Wallingford, was also infuriated by his speech. He was in attendance at the meeting in question. From there, we go into page 30, where we discuss that he met with Ruckel, Wallingford, and the remaining defendants, which implicates Thomas and Kennedy, to illegally retaliate against Kerry and Guy for their protected speech at the meeting. Then you go to paragraph 36, where the article is issued, where we talk about how this demonstrates the requisite intent to further the conspiracy. You take this as a whole. You realize that, ultimately, Wallingford is implicated in paragraphs 30, 33, 34, 35, 36, 37, 43, 44, 45, 46. He's implicated throughout the complaint as a knowing participant in the conspiracy to retaliate against my clients. Further, you're honest. I mean, all of those other paragraphs don't mention him doing anything. They don't mention him. I mean, you're saying he's implicated, but that's assuming that he's part of the conspiracy. Then, okay, maybe he gets tagged with the things that his co-conspirators are doing. But it really just comes down to, he was at a meeting. This paragraph, he conspired to illegally retaliate. Then he acted with requisite conspiratorial purpose. I mean, those are the allegations against him, specifically. That sounds pretty conclusory to me. There are no other facts put about him. What else? Your Honor, I would maintain that the op-ed in itself, the publication to further the conspiracy, was sufficient, especially when looking to Barrett versus Harrington, which is a case that ultimately holds that even if this would be protected in other contexts, if it's done in furtherance of a conspiracy to violate rights, then it loses its constitutional protections, whether it be under Norbert Pennington or under the First Amendment. It further demonstrates just the ultimate common goal of the retaliation campaign, which this one, in my view, furthers the harassment campaign, which we can get into with the other defendants as well. You're saying he could be punished for submitting an op-ed to the paper? If done with the intent to deprive the plaintiffs of their constitutionally protected rights, if done in coordination with state actors, which is what we have here, at least as pled in the complaint. That would be a question for the jury of whether that's sufficient, but we're at the motion to dismiss stage, and at that point, it's the duty to construe the complaint in a light most favorable to the plaintiff. Your Honor, back onto, and further, just one more reminder on this motion to dismiss, there are ultimately no magic words in 1983 conspiracy. The Rudd complaint was far less detailed than the complaint that we have here today. But back onto my response to some of the summary judgment issues. In Northern Kentucky Right to Life case, the central holding of that is that opinion alone is not sufficient, and that's one of the further responses as well. As I mentioned, these were overt actions, but further on the summary judgment, we have to look to the inferences of these issues. So we have, as of March of 2018, Ruckel is saying that he has no claim to the Cox property, and then within a mere four days after this meeting, they're taking action. The Anders case is four months alone is sufficient. So we can clearly see here under those inferences that summary judgment should have been denied the way that we have with causation. That's almost always an issue for the jury. Another issue that demonstrates the need for that inference is the potential spoliation issues that we have, where there was a demand to preserve Ruckel's email address. What's the best case on Ruckel that take the easement, because we're focused on getting the easement, right? How is that clearly established? I would state that, I would say that Fackery and Fritz are the two best cases for this. So Fackery and Fritz demonstrate that even so much as the denial of... One of them is unpublished, I think. I'm sorry, Your Honor. Fackery, that's the unpublished one? Yes, but then we have Fritz as well, which shows that so much as a denial of a zoning permit, even if legitimate, can be sufficient adverse. But in Fritz, we said specifically that it went to the, this is the woman that was the insurance agent, is that right? Yes, Your Honor. Okay. So the zoning part, well, first of all, they called her employer and that would be problematic and not really this case. But the zoning part, I think we specifically said it went to her economic livelihood. And that would, I mean, we've said if you're going to put economic pressure on somebody, okay, that's an adverse action, right? Because this stuff comes out of employment law, really. I don't see that here. And Your Honor, in this, the key of Fritz was the tangibility of this property issue. So on the tangibility side of this, this led to the greater opening up of a harassment campaign that led to 71 days of siege, animals being shot and poisoned. Harassment that Ruckel himself took part in, according to the Malone's depot, at Dock ID 1701. And we can talk about the issues behind this. But this was all part of a concerted plan to ensure that the Cox family received punishment for their constitutionally protected speech. If we're talking about what's going on in D.C., we should be talking about what's going on in Lewis County of the government conspiring to ultimately retaliate against people for their constitutionally protected speech. It's for that reason that I asked for reversal. Any further questions, Your Honor? Thank you, counsel. Thank you all very much for your arguments. The case will be submitted.